**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

BERNABE ENCARNACION,

                                        Plaintiff,                          9:15-cv-01411 (BKS/ML)

v.

J. SPINNER, et al.,

                                        Defendants.

---

**Appearances:**

*For Plaintiff:*
Elmer Robert Keach, III
Maria K. Dyson
Law Offices of Elmer Robert Keach, III, PC
One Pine West Plaza, Suite 109
Albany, NY 12208

*For Defendants:*
Letitia James
Attorney General for the State of New York
Kostas Leris
The Capitol
Albany, New York 12224-0341

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.     INTRODUCTION

       Plaintiff Bernabe Encarnacion, a New York state inmate, brings this civil rights action

under 42 U.S.C. § 1983, raising claims arising out of his incarceration at the Upstate and Clinton

Correctional Facilities.[1] Following review under 28 U.S.C. § 1915, the following claims

survived: (1) Eighth Amendment excessive force claims against Defendants James Spinner, Guy

---

[1] Plaintiff initially proceeded pro se. On November 27, 2017, Plaintiff was appointed counsel. (Dkt. No. 69).

Soucia, and Adam Ripa; (2) Eighth Amendment failure to intervene claim against Defendant Jon

Oropallo (3) Eighth Amendment medical indifference claims against Defendants Richard

Adams, Vincent Somalis, and Rebecca Waldron; (4) Fourteenth Amendment due process claims

against Defendant Spinner, and (5) First Amendment retaliation claims against Defendants Ripa,

Adams, and Waldron. (Dkt. No. 10, at 27).[2] Defendants now move for summary judgment under

Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 103). The parties have filed

responsive briefing. (Dkt. Nos. 124, 130). For the reasons that follow, Defendants' motion is

granted in part.

## II.   RECORD BEFORE THE COURT

Defendants argue that, with the exception of deposition transcripts, Plaintiff's exhibits,

which are "annexed" to Plaintiff's attorney affirmation, "are improperly submitted and should

not be deemed as part of the record before the Court." (Dkt. No. 130, at 4). The depositions and

other exhibits, however, primarily appear to be records generated in discovery. (Dkt. No. 124, at

2–3).[3] Defendants do not appear to dispute the source or authenticity of the exhibits apparently

generated in discovery; Defendants argue that the exhibits should have been authenticated by

Plaintiff, not his counsel. (Dkt. No. 130, at 4 n.1). While "attorney affidavits are not part of the

record for purposes of a motion for summary judgment," *Hines v. City of Albany*, No. 06-cv-

01517, 2011 WL 2620381, at *3, 2011 U.S. Dist. LEXIS 68548, at *10 (N.D.N.Y. July 1, 2011),

*aff'd sub nom. Hines v. Albany Police Dep't*, 520 F. App'x 5 (2d Cir. 2013), the Court will

---

[2] Claims against certain unidentified Doe Defendants survived § 1915 review but were dismissed by Text Order on June 5, 2019. (Dkt. No. 96). Claims also survived against Anthony Annuci, David Rock, and Albert Prack; those claims were dismissed by stipulation on July 9, 2019. (Dkt. No. 98).

[3] The one exception appears to be the "sample witness statements and assistance forms," which Defendants argue are irrelevant because they relate to a more serious Tier III disciplinary hearing, not the Tier II disciplinary hearing at issue here.  (Dkt. No. 130, at 10) (referencing Dkt. Nos. 124-26, 124-27 and 124-28). The Court has not considered those sample forms.

consider the attached record evidence in resolving the present motion. *See e.g.*, *Somlyo v. J. Lu-Rob Enters., Inc.*, 932 F.2d 1043, 1044 (2d Cir. 1991) (holding "that the district court has power to interpret the Local Rules as well as the discretion to determine when fairness demands that departure from the Local Rules be excused").

## III.    FACTS[4]

### A.    Misbehavior Report for Scratches on Cell Window

Plaintiff testified that he speaks "very little English.[5] (Dkt. No. 103-2, at 5). On January 24, 2013, Plaintiff was transferred from another prison to Upstate Correctional Facility ("Upstate"). (Dkt. No. 103-14). Apart from a temporary stint at Attica Correctional Facility ("Attica"), Plaintiff remained at Upstate from January 24, 2013 until September 30, 2013. (Dkt. No. 126, ¶ 1; Dkt. No. 103-13, ¶ 14).

On March 11, 2013, Plaintiff was moved to a new cell. (Dkt. No. 103-26, at 1; Dkt. No. 126, ¶ 4). On March 14, 2013, Plaintiff's cell was inspected by Corrections Officer Schrader. (Dkt. No. 124-3). According to the Cell Inventory Checklist, which Plaintiff signed, Plaintiff's cell window was not scratched. (*Id.*; Dkt. No. 124-4, at 14, 20–21). On May 12, 2013, Officer Schrader issued Plaintiff an inmate misbehavior report for allegedly scratching the cell window. (Dkt. No. 103-24, at 1). Plaintiff testified that he was given a copy of the misbehavior report the next day but never in Spanish. (Dkt. No. 103-2, at 110, 111–12). Plaintiff denied the allegations

---

[4] The facts are drawn from the parties' statements of material facts, (Dkt. Nos. 103-40, 126), their responses thereto, (Dkt. Nos. 126, 130-1), and the evidence attached to the parties' submissions, including Plaintiff's verified complaint. (Dkt. No. 1). The Court has also reviewed the surveillance videos in the record. (*See* Dkt. Nos. 103-9, 124-9). The facts are taken in the light most favorable to Plaintiff. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

[5] Plaintiff also testified that he is legally blind, having been diagnosed with muscular atrophia, in late 2015 or 2016, after the events in this case. (Dkt. No. 126, ¶ 15; *see also* (Dkt. No. 103-2, at 5; Dkt. No. 103-23, ¶ 14; Dkt. No. 124-4, at 2; Dkt. No. 124-20, at 2; Dkt. No. 124-21, at 2). The parties dispute the extent of Plaintiff's ability to speak English. (*E.g.*, Dkt. No. 126, ¶ 15; *see also* (Dkt. No. 103-2, at 5; Dkt. No. 103-23, ¶ 14; Dkt. No. 124-4, at 2; Dkt. No. 124-20, at 2; Dkt. No. 124-21, at 2).

in the report and maintained that the window was scratched when he moved into the cell. (*Id.* at 111; Dkt. No. 124-4, at 11–12).

### B.     Disciplinary Hearing Related to Scratches on Cell Window

Plaintiff's disciplinary hearing related to the misbehavior report was initially scheduled for May 23, 2013, with Defendant James Spinner serving as the hearing officer. (Dkt. No. 126, ¶ 12; Dkt. No. 124-2, at 2). According to Spinner, he had a long conversation with Plaintiff in English before the hearing began, and did not believe that Plaintiff needed an interpreter, but adjourned the hearing to May 28th to give Plaintiff a Spanish-speaking interpreter after Plaintiff requested one. (Dkt. No. 103-23, at 2-3; Dkt. No. 124-4 at 2-3). Spinner did not appoint an assistant for Plaintiff.[6]

At the hearing, when asked to explain the signed inspection checklist, Plaintiff contended that Officer Schrader had presented him with a blank form with "[j]ust check marks." (Dkt. No. 124-4, at 21–22). However, at an earlier point during the hearing, Plaintiff testified that he signed the form without looking at it. (*Id.* at 8). Plaintiff also contends that he was only shown an English checklist and that no one translated it for him.[7] (*E.g.*, Dkt. No. 126, ¶¶ 5–8). Spinner found Plaintiff guilty of "destroying and damaging state property." (Dkt 124-4, at 25; Dkt. No. 103-23, ¶ 40). Spinner found Plaintiff guilty based on Officer Schrader's testimony, her written report, the cell inspection sheet, and the photographs of Plaintiff's cell window. (Dkt. No. 103-24, at 2–4; Dkt. No. 103-23, ¶ 40; Dkt. No. 124-4, at 25; Dkt. No. 126, ¶¶ 38–39, 46).

---

[6] Under New York regulations, "an inmate is only entitled to an assistant at a Tier II disciplinary hearing if the inmate is (1) illiterate or Limited English Case Proficient, (2) 'sensorially disabled' and requires assistance such as a sign language interpreter, or (3) charged with drug use." (Dkt. No. 126, ¶ 14); *see* 7 N.Y.C.R.R. § 251-4.1.

[7] Plaintiff did not testify to this effect at his disciplinary hearing or at his deposition, but the only form in the record is in English. (*See* Dkt. No. 124-3).

Spinner imposed the following penalties: first, Spinner reinstated a sentence stemming from a 2012 incident that had been suspended. (Dkt. No. 126, ¶ ¶¶ 40–14; Dkt. No. 124-4, at 24). That sentence included three months of Special Housing Unit ("SHU") confinement, as well as three months' loss of packages, commissary, and phone privileges. (Dkt. No. 126, ¶ 40; Dkt. No. 124-4, at 24). In addition, as a result of the May 12th misbehavior report, Spinner sentenced Plaintiff to 30 days of keeplock, 30 days' loss of packages, 30 days' loss of commissary, and $52 in restitution for the damaged cell window. (Dkt. No. 126, ¶ 45; Dkt. No. 124-4, at 24).

In November 2013, an assistant attorney general in the New York Attorney General's office opined that "a reversal [was] warranted on the grounds that Plaintiff was not afforded a tier assistant," as required for an inmate who is either illiterate or non-English speaking." (Dkt. No. 124-7; *see also* Dkt. No. 103-26, at 2 (charges from March 2013 incident absent from Plaintiff's disciplinary history)).

### C.    Alleged May 28, 2013 Excessive Force Incident Following Disciplinary Hearing

According to Plaintiff, after the hearing, while Plaintiff's hands and feet were handcuffed and his face was up against a wall, Spinner, Defendant Guy Socia, and two other corrections officers jumped on Plaintiff, "thr[e]w [him] against the wall and . . . start[ed] hitting" him "all over [his] body." (Dkt. No. 103-2, at 36–39). Because he was facing the wall, Plaintiff could not see who was hitting him. (*Id.* at 41).

Plaintiff testified that he grieved this alleged use of force to the Inmate Grievance Resolution Committee (the "IGRC"). (*Id.* at 55–56, 58). However, according to Defendants—by way of declarations submitted by the New York State Department of Corrections and Community Supervision ("DOCCS") Inmate Grievance Program staff—no timely record of any grievance from this incident exists, even though Plaintiff filed other unrelated grievances from

January 24, 2013 through September 30, 2013, including grievances that post-dated this alleged use of force. (Dkt. No. 103-13, ¶¶ 13–20; Dkt. No. 103-16, ¶¶ 14–20 Dkt. No. 103-20, ¶¶ 11–12).

On July 23, 2013, while temporarily confined at Attica, Plaintiff filed a grievance complaining that he was being improperly confined in the SHU. (Dkt. No. 103-19, at 4; Dkt. No. 126, ¶ 48). In that grievance, Plaintiff complained that his SHU release date was moved from "5/30/13 to 8/30/13 after [Spinner] and three other [corrections officers] beat[] me up on 5/28/13 . . . without reasons." (Dkt. No. 103-19, at 4; Dkt. No. 126, ¶ 49). That grievance was appealed to the Central Office Review Committee (the "CORC"). (Dkt. No. 103-22, at 1). With respect to Plaintiff's complaint related to the alleged May 28th use of force incident, the CORC responded that the "allegations are untimely and will not be addressed." (*Id.*).

### D.      Plaintiff's Time in the SHU

Following the May 28, 2013 hearing Plaintiff testified that he spent 126 days in disciplinary housing.[8] (Dkt. No. 103-2, at 114; Dkt. No. 130-1, ¶ 11). Plaintiff further testified that he was confined to his cell for 23 hours per day with one hour for recreation but that "[m]any times they did not open the door for [Plaintiff]," and that he was denied recreation the "majority of the time" that he was in disciplinary housing. (Dkt. No. 103-2, at 116). Further, the water in Plaintiff's cell sink and toilet was not always working. (*Id.* at 114–15). Plaintiff further testified that he was denied meals, that "[m]any times, lots of times" he would be served a plate that was empty, (*id.* at 118), or that there was would be spit and "other stuff" on his plate. (*Id.* at 119). Plaintiff further testified that he was generally permitted two showers per week but some weeks was only given one. (*Id.*).

---

[8] Defendants claim Plaintiff spent only 122 days in disciplinary housing. (*See* Dkt. No. 130-1, ¶ 11).

### E.       Alleged September 30, 2013 Excessive Force and Sexual Assault Incident

On September 30, 2013, Plaintiff was scheduled to be transferred from Upstate to

Clinton. (Dkt. No. 126, ¶ 65; Dkt. No. 103-2, at 71). Plaintiff was brought to Upstate's draft

room in preparation for transfer. (Dkt. No. 103-9; Dkt. No. 126, ¶ 65). Within the draft room,

there is a strip frisk room where prisoners are strip frisked prior to being transferred. (Dkt. No.

124-38, at 42; Dkt. No. 103-9). Diagonally across from the strip frisk room is an ID room where

prisoners go to have an updated photograph taken, if necessary, prior to being transferred.[9] (Dkt.

No. 126, ¶ 66; Dkt. No. 124-38, at 36–37, 60; Dkt. No. 103-9). There are two holding cells in the

draft room: one on the same side of the room as the ID room ("the holding cell next to the ID

room") and one across the room from that holding cell. (*Id.*).

Based upon a surveillance video Defendants produced of the draft room, the process that

morning appeared to be as follows: prisoners were taken from the holding cell across from the ID

room to a place near the strip frisk room where the prisoners' handcuffs were removed, the

prisoners were placed in a BOSS chair near the strip frisk room, brought into the strip frisk room,

and then either placed directly into the holding cell next to the ID room or taken to the ID room

for an updated photograph before being placed in the holding cell next to the ID room. (*Id.*; Dkt.

No. 124-38, at 36–37, 60).

Plaintiff testified to the following events. Plaintiff was going through a "strip inspection"

in preparation for the transfer. (Dkt. No. 103-2, at 71). Defendant Adam Ripa "started taking off

[Plaintiff's] chains" and handcuffs while "another officer was with him." (*Id.*). All three were

standing "next to the sergeant who is the area supervisor."[10] (*Id.*). As Ripa was taking off

---

[9] A new photo would be required if the prisoner's appearance had changed since the prior photo had been taken. (Dkt. No. 124-36, at 16–17).

[10] Defendant Jon Oropallo was Draft Supervisor that day. (Dkt. No. 103-32, ¶ 7).

Plaintiff's handcuffs he told Plaintiff, "I'm going to do you dirty because [Plaintiff has] complaint [sic] against [Ripa]." (*Id.*). Plaintiff had grieved Ripa on March 3, 2013 and testified that he files "a lot of grievances against him and his coworkers." (Dkt. No. 124-1; Dkt. No. 103-2, at 122).

After Plaintiff's strip inspection, he was taken to the ID room. (*Id.* at 71). With the door to the ID room open, Ripa and another officer "start[ed] beating" Plaintiff. (*Id.* at 71–72). Ripa struck Plaintiff first "in the stomach" with a "[c]losed fist" while wearing gloves. (*Id.* at 75). Plaintiff testified that if prisoners and staff were "looking they would be able to see" the assault. (*Id.* at 89). Plaintiff could not recall how many times he was hit in the stomach but that "with the first blow" Plaintiff fell to the floor and lost consciousness. (*Id.* at 72, 75). When Plaintiff regained consciousness, his pants and underwear were "halfway by [his] knees." (*Id.* at 72, 76). "As soon as [Plaintiff] recovered consciousness," he felt pain in his buttocks, which he described as though "something was burning [him] in that region." (*Id.* at 77). Plaintiff has no recollection of being raped or sodomized "because [he] was unconscious on the floor."[11] (*Id.* at 78). When he awoke, Plaintiff was on his side as Ripa and the second officer stood in front of him. (*Id.* at 75–76). According to Plaintiff, Oropallo heard Ripa's alleged remark about doing Plaintiff dirty, and he—along with other prisoners and staff—"stood back outside of the ID room watching." (*Id.* at 88–89).

The video of the draft room establishes that Plaintiff was inside the ID room for approximately 90 seconds.[12] (Dkt. No. 103-9, 06:27:18–06:28:47; Dkt. No. 126, ¶¶ 69–70). At

---

[11] In his opposition to summary judgment Plaintiff suggests that he may have been sodomized with an officer's baton. (*See* Dkt. No. 125, at 11, 17).

[12] The surveillance footage shows four panels depicting different parts of the draft room on September 30th. (Dkt. No. 103-9.). Ripa testified that the outside of the ID room is shown in the lower-left panel (which is just to the left of the holding cell shown in the bottom-right panel). (Dkt. No. 124-38, at 37; Dkt. No. 126, ¶ 68). The outside of the ID room is difficult to make out because of brightness in the video. (Dkt. No. 103-9). The upper-left panel shows the

approximately 6:19 a.m., a guard unlocks the holding cell across from the ID room; Plaintiff

exits that cell and makes his way near the outside of the strip frisk room where he appears to be

searched by two corrections officers. (Dkt. No. 103-9, 06:19:07). After that, Plaintiff sits in the

BOSS chair before entering the strip frisk room. (*Id.*, 06:20:04–27; Dkt. No. 124-38, at 47).

Plaintiff exits the strip frisk room at approximately 6:27 a.m. (Dkt. No. 103-9, 06:26:48). As

Plaintiff emerges from the strip frisk room there appear to be four officers gathered around a

desk in the middle of the draft area. (*Id.*, 06:26:48). Plaintiff exits the room along with five

officers and another prisoner. (*Id.*, 06:26:54). The video shows a corrections officer open the

door to the holding cell next to the ID room for a moment before closing it; an officer wearing

gloves then appears to direct Plaintiff, pointing to the ID room. (*Id.*, 06:27:10). Plaintiff enters

the ID room at approximately 6:27:18 a.m. with one and possibly another officer, although the

video is not clear.[13]  (Dkt. No. 126, ¶ 69; 103-9, 06:27:18). While Plaintiff is in the ID room,

some movement within the ID room appears to be visible. (*Id.*, 06:27:22–06:28:45). Prisoners

can be seen sitting in the holding cell next to the ID room during this time. (*Id.*). Plaintiff exits

with a corrections officer's hand on his back at about 6:28:47. (*Id.*, 06:28:47). Plaintiff enters the

cell next to the ID room at 06:29:00.[14] (Dkt. No. 126, ¶ 70; Dkt. No. 103-9, 06:29:00). There are

---

holding cell across from the ID room, and the upper-right panel shows people coming and going from the strip frisk room. (*Id.*).

[13] Although Ripa did not identify himself at his deposition as being shown in the surveillance video, he acknowledged that a corrections officer in the video depicted coming out of the strip frisk room was "approximately [his] height", and that the physical description of the officer with his hands on Plaintiff's back after leaving the ID room "looks like" it matches Ripa's physical description. (*E.g.*, Dkt. No. 124-38, at 51–52, 64; Dkt. No. 103-9). This officer was wearing gloves, (Dkt. No. 124-38, at 46), and Ripa further testified that "it did not look like" that person was carrying a baton in the surveillance footage. (*Id.* at 68).

[14] Plaintiff remained in that cell until 6:50:23, when it appears that Plaintiff, along with two other inmates, was moved to the holding cell on the opposite side of the draft room. (Dkt. No. 103-9, 6:50:23). Plaintiff did not show signs of any distress when he walked across the draft room to the other holding cell. Plaintiff asserts that after he left the ID room, the video shows him walking "in an unsteady manner, and in manner different than he walked into the [ID] room," (Dkt. No. 126, ¶ 70), but there does not appear to be any difference in how Plaintiff is walking in any part of the video, before or after he went to the ID room. *Compare* (Dkt. No. 103-9, 06:20:00 (Plaintiff walking to the strip frisk room) *with* (*id.* at 06:26:46, 06:28:48 (Plaintiff walking to and from ID room) *and* (*id.* at 06:50:23) (Plaintiff

several officers in the draft room visible in video. While the outside door of the ID room is not clearly visible on the video, there is no indication of any commotion among any of the officers in the draft room at any time during the time Plaintiff was in the ID room or during the time he was returned to the holding cell from the ID room.

Plaintiff testified that after he was allegedly assaulted, he was returned to "the holding cell"; that other prisoners "saw everything"; and that when Plaintiff returned, they "told [Plaintiff] what happened." (Dkt. No. 103-2, at 82). Plaintiff testified that they could "see through the door because they [were] in front, front to front." (*Id.* at 82–83). It does not appear from the video that inmates in this holding cell, which was *next to the ID room,* could see the ID room. Plaintiff testified that he told them that his "whole body was in pain" and that the witnesses "called [Sergeant Oropallo] and told him how [Plaintiff] was and what they saw." (*Id.* at 82).

According to Plaintiff, after Oropallo called to get Plaintiff to the medical unit, an officer wheeled Plaintiff to the facility hospital. (*Id.* at 83–84). The surveillance footage corroborates that Plaintiff was taken in a wheelchair by a nurse and a corrections officer at about 7:35 a.m., approximately one hour after exiting the ID room. (Dkt. No. 103-9, 7:35:30). According to Plaintiff, when he arrived, he reported that the officers had jumped on him and given him "a beat down," and the officer who "wheeled [Plaintiff] in told the nurse not to report anything," at which point he was pulled out of the medical wing and "sent back to the draft room." (Dkt. No. 103-2, at 84). The video shows that Plaintiff returned to the draft area about ten minutes after he had left, still in a wheelchair, and put back into one of the holding cells at about 7:45 a.m. (Dkt.

---

walking across the draft room to the holding cell on the other side of the room)). Plaintiff walks with a limp as a result of knee surgery that predates the alleged incident. (Dkt. No. 103-2, at 94).

No. 103-9, 7:44:44). Although Upstate medical staff cleared Plaintiff to be transferred, (Dkt. No. 126, ¶ 75), no medical records reflect any interaction between Plaintiff and the medical staff that morning. (Dkt. No. 130-1, ¶ 16).

Two prisoners who were in a holding cell with Plaintiff that day provided written statements during a subsequent Inspector General investigation into this incident. (Dkt. Nos. 124-20, 124-21). Neither inmate reported having seen a sexual assault or having been told by Plaintiff that he had been sexually assaulted.

The first witness said that Plaintiff was "escorted to the I.D. room for a new photo" and while Plaintiff was in the ID room, the witness "heard a commotion." (Dkt. No. 124-20, at 1). The witness further stated that he "couldn't see into the I.D. room," that he "wasn't really paying attention," and that Plaintiff was in there for "a few minutes." (*Id.*). The witness further stated that when Plaintiff "came back he told me that his ribs and chest hurt." (*Id.* at 1–2). After Plaintiff told the Sergeant, a nurse came and took him in a wheelchair to medical. (*Id.* at 2). According to that witness, when Plaintiff came back from medical, Plaintiff told him that "they didn't do anything for him in medical." (*Id.*). Five to ten minutes after he returned from medical, Plaintiff was "holding his hand on his chest and ribs." (*Id.*). That witness said that he "didn't see anyone assault or sexually assault" Plaintiff or see "any staff acting inappropriately." (*Id.* at 3).

The second witness's description of how he was in a position to see into the ID room does not appear to be consistent with the video or the procedure followed in the draft room. This witness stated that after he was strip frisked, he was placed in a holding cell "*across* from the holding cell" next to the ID room. (Dkt. No. 124-21, at 1). This witness stated that he "saw an officer escort [Plaintiff] into the ID room" and while in the ID room, he "saw the officer (unknown, unable to describe) swing his arm." (*Id.* at 1–2). The witness stated that he

"assume[d] that [the officer] was hitting" Plaintiff but did not see the officer strike him. (*Id.* at 2). This witness stated that Plaintiff "was in the ID room for about fifteen minutes" and that he "didn't see anyone sexually assault" Plaintiff. (*Id.*). According to this witness, after Plaintiff was "done in the ID room," Plaintiff entered the holding cell that the witness was in and "started complaining that he was hurt" but that he could not recall where Plaintiff was hurt, stating that it was "maybe his chest." (*Id.*). The video, however, establishes that immediately after Plaintiff exited the ID room, he was placed in the holding cell *next to* the ID room and that from there an inmate could not see into the ID room. (Dkt. No. 103-9).

Ripa testified at his deposition that he had no recollection of being in the ID room with Plaintiff. (Dkt. No. 124-38, at 67). He further testified that he has never seen a prisoner assaulted by a corrections officer. (*Id.* at 67–68). Oropallo states that he "did not witness [P]laintiff being assaulted, sexually or otherwise, by any staff at Upstate." (Dkt. No. 103-32, ¶ 21). Instead, Oropallo states that Plaintiff never told him about any assault, that Plaintiff complained of chest pains, that Oropallo contacted medical staff, that a nurse took Plaintiff to medical for evaluation, and that Plaintiff returned to the draft area ten minutes later.[15] (*Id.* ¶¶ 16–21).

As a result of the alleged incident, Plaintiff testified that he suffered the following injuries: rectal bleeding, pain in "the whole body," pain in his jaw, and blood in his "fecal matter." (Dkt. No. 103-2, at 79). Plaintiff had rectal burning for "[a]bout a month or so" and that going to the bathroom was "very painful." (*Id.*). He also had difficulty eating and sleeping. (*Id.* at 81). Plaintiff also suffered chest pains, which he had never had before. (*Id.*).

---

[15] Non-party witness Sergeant Robert Gill also testified that he did not recall seeing Plaintiff sexually or physically assaulted in the draft or ID room on September 30, 2013, and that if he had seen any corrections officer assault Plaintiff, he would have been required to intervene in the moment to protect Plaintiff and that he also would have been required to notify a lieutenant. (Dkt. No. 124-36, at 31–32).

### F.      Plaintiff's Arrival at Clinton on September 30th

On the way to Clinton, Plaintiff testified that he complained about "[c]hest pain and pain in the whole entire body" and that the transfer officers "saw what happened." (*Id.* at 85).

### 1.      Medical Care

It is undisputed that when Plaintiff arrived at Clinton, he was sent to the emergency room complaining of chest and back pain. (Dkt. No. 126, ¶ 76; Dkt. No. 103-33, ¶ 9; Dkt. No. 103-34, at 5). Plaintiff testified that he saw Defendant Dr. Richard Adams and "another nurse." (Dkt. No. 103-2, at 95). Plaintiff claims he told Adams what happened and that he had chest pains, but Adams "didn't [take] any notes." (*Id.* at 91, 95). Plaintiff testified that the "only thing [the medical staff] did" that day was check his blood pressure. (*Id.* at 96). Plaintiff testified that once he raised the topic of the assault, "they stop[ped] doing everything." (*Id.*).[16]

According to the prison medical records, it appears that Plaintiff was first seen by Nurse Robert Fitzgerald,[17] and that Nurse Fitzgerald referred him to Adams. (Dkt. No. 103-34, at 5; Dkt. No. 124-35, at 41–42). The medical records reflect that Plaintiff's temperature, blood pressure, pulse, and breathing were measured. (Dkt. No. 103-34, at 5; Dkt. No. 103-33, at 2). None of the medical or security records generated at Clinton on September 30th reflect that Plaintiff complained about an assault.

Adams evaluated Plaintiff in the emergency room and concluded that Plaintiff's heart and lungs were functioning normally and that he should be seen for a follow up for chest pain, if

---

[16] In addition to taking Plaintiff's blood pressure, medical records from that day indicate notations for his pulse rate and his temperature. (Dkt. No. 103-36, at 1). Nurse Fitzgerald also testified, while reviewing the medical record from that visit, that he listened to Plaintiff with a stethoscope and measured his "blood level of oxygen." (Dkt. No. 124-35, at 41). When asked whether the notations on the medical records reflecting these measurements were made up, Plaintiff responded, "I could not answer to that, I don't know what they did" and that they "didn't do any of that." (Dkt. No. 103-2, at 97).

[17] The relevant medical record, dated September 30, 2013, does not state a time at which Nurse Fitzgerald assessed Plaintiff. (*See* Dkt. No. 103-34, at 5).

needed. (Dkt. No. 126, ¶ 76; Dkt. No. 103-33, ¶¶ 12–13). Adams states that it was his "assessment" that Plaintiff "appeared to be seeking pain medication with complaints of general pain" without "any specifics as to the cause or extent of his pain." (*Id.* ¶ 14). Adams further states that at no time during this evaluation "did [Plaintiff] allege that he had been physically and sexually assaulted at Upstate." (*Id.* ¶ 16). Nurse Fitzgerald testified that, based on looking at the medical record he generated that day, Plaintiff did not report that he had been assaulted or sexually assaulted because he "would have noted it." (Dkt. No. 124-35, at 45). Adams identified his handwritten notes on the medical records; one such note by Adams states, "No English." (Dkt. No. 103-36, at 5; Dkt. No. 124-34, at 80).

Plaintiff testified that after he was evaluated by Adams and the nurse, he was then sent to his cell at Clinton where Defendant Nurse Rebecca Waldron came to interview him. (*Id.* at 97–98). Plaintiff testified that he told Waldron that he "was assaulted and raped . . . and she totally disregard[ed] that, she ignored that," saying "I don't care." (*Id.* at 92, 95, 99; Dkt. No. 124-8, at 1). Plaintiff denies that Waldron asked him the general questions about his health and medications that are reflected in a two-page health screening form completed that day. (Dkt. No. 103-2, at 98; Dkt. No. 103-36, at 3–4). According to Plaintiff, Waldron discontinued Naproxen and Neurontin prescriptions as soon as he "report[ed] the assault. Right on the spot she cross[ed] it [off]."[18] (Dkt. No. 103-2, at 124).

Records reflect that Waldron gave Plaintiff a health screening. (Dkt. No. 126, ¶ 82; Dkt. No. 103-35, ¶¶ 8, 12; Dkt. No. 103-36, at 1–4). During the evaluation, Waldron asked Plaintiff to list every medical problem he had; according to Waldron, and as reflected in the screening form,

---

[18] In the grievance dated October 16, 2013, Plaintiff asserted that it was Adams who discontinued the medication. (Dkt. No. 124-31). Waldron states that Adams discontinued the medications "until Plaintiff could be examined by a primary care physician" and that, as a registered nurse she was "not authorized to discontinue an inmate's prescriptions." (Dkt. No. 103-35, ¶ 31–32).

Plaintiff indicated that his only medical issues were lower back pain, acid reflux, and glaucoma. (Dkt. No. 103-35, ¶¶ 16–17; Dkt. No. 103-36, at 1, 3–4). As part of this evaluation, Plaintiff was asked to list every medication he was taking so that the "primary care physician at Clinton" can "examine the inmate and review his medications" and decide to "either refill the inmate's prescriptions or discontinue them." (Dkt. No. 103-35, ¶¶ 18, 20–22). Plaintiff told Waldron that he was taking five medications, and she referred him to a primary care physician to have his medications reviewed. (Dkt. No. 126, ¶¶ 83–84; Dkt. No. 103-35, ¶¶ 22–23). Waldron states that at no time during this evaluation did Plaintiff allege that he had been physically or sexually assaulted at Upstate.  (Dkt. No. 130-35, at 4).

## 2.   Initial Security Interview

After Plaintiff spoke to Waldron on September 30, 2013, he was interviewed by Defendant Sergeant Vincent Samolis. (Dkt. No. 103-2, at 92; Dkt. No. 126, ¶ 85). According to Plaintiff, he told Samolis that he "was attacked physically and sexually" and that he was bleeding "[b]y the anus." (Dkt. No. 103-2, at 92, 100). Somalis "totally disregarded" Plaintiff's claim of assault and told Plaintiff to "write a letter to the deputy of security." (*Id.* at 92–94).

Samolis has submitted a declaration explaining that on September 30th he conducted initial security interviews of the inmates transferring into Clinton, and it was his duty to determine whether the inmates could be placed in general population or needed specialized housing.  (Dkt. No. 103-38, ¶¶ 7, 10). Samolis stated that he "filled out an Initial Security Interview form," as he interviewed Plaintiff, and that that the form "required" Samolis to ask Plaintiff "personal questions, such as whether [Plaintiff] . . . was a victim of abuse." (*Id.* ¶¶ 9, 13; Dkt. No. 103-39). Samolis stated that at "no time during [his] evaluation of [P]laintiff on September 30, 2013 did he allege that he had been physically and sexually assaulted at Upstate." (Dkt. No. 103-38, ¶ 15). During the interview Somalis gave Plaintiff a Prison Rape Elimination

Act ("PREA") orientation packet, which "contained information on how to report sexual abuse of any kind." (Dkt. No. 103-38, ¶ 11; Dkt. No. 126, ¶ 86).

Adams, Waldron, and Samolis each stated that this was the first time they had ever had contact with Plaintiff. (Dkt. No. 103-33, ¶ 7; Dkt. No. 103-35, ¶ 7; Dkt. No. 103-38, ¶ 6). Departmental policy and procedure would have required Adams, Samolis, and Waldron to report Plaintiff's alleged complaints of abuse to their superiors. (Dkt. No. 126, ¶ 100).

### G.     Dr. Adams' Review of Plaintiff's Prescriptions

The next day, October 1st, Adams reviewed Waldron's request regarding Plaintiff's prescription renewals. (*Id.* ¶ 88). Adams states that he renewed Plaintiff's prescriptions for three medications because they treat acid reflux and glaucoma. (Dkt. No. 103-33 ¶ 25). Adams, however, declined to renew Plaintiff's Naproxen and Neurontin prescriptions. (Dkt. No. 126, ¶ 91). According to Adams, the Naproxen was not renewed because it can worsen conditions such as acid reflux, which Plaintiff had. (*Id.* ¶ 92; Dkt. No. 103-33, ¶ 26). He further stated that he decided not to renew the Neurontin because in his earlier evaluation of Plaintiff, he found Plaintiff was "seeking pain medication without being able to provide any specifics about the cause or extent of his pain" and that it therefore should not be prescribed until Plaintiff "was fully evaluated by a provider." (Dkt. No. 103-33, ¶ 27).

### H.     Letters and Grievances Regarding the Alleged Assault and Discontinuation of Medication

Plaintiff sent letters dated October 10th regarding the alleged September 30th assault to several individuals, including DOCCS officials and United States District Judge Charles Siragusa. (Dkt. Nos. 124-14–18). Judge Siragusa sought follow up from the New York State Attorney General's office on the matter. (Dkt. No. 124-19, at 1–2).

Plaintiff also filed a grievance, dated October 12th, relating to the alleged assault. (Dkt. No. 124-8). In the grievance, Plaintiff stated that he was assaulted, beaten up, and sodomized by Ripa and an officer inside the ID room. (*Id.*). He further stated that the "assaults" "and rape" were witnessed and observed by several officers and inmates, including the area sergeant supervisor and that it was "recorded by the surveillance cameras in the ID room." (*Id.*). He further stated that he was taken in a wheelchair to the emergency room at both Upstate and Clinton and returned "without received [sic] any medical attention or treatments to [his] internal and external injures that [he] sustained." (*Id.*). He further stated that he reported the assault to various employees, including "the transferred [sic] officers," Waldron and "Sgt. Samos III"[19] and that "to date" he has not received "medical attention or treatments to [his] injuries." (*Id.*).

Plaintiff filed another grievance dated October 16th complaining that his "pain medication has been discontinued by Dr. Adams." (Dkt. No. 124-31). Plaintiff appears to further state that he was ordered and directed to file sick calls, which he stated that he has "been doing . . . every sick call day since then." (*Id.*). He further stated that he requires these medications to control his "chronic back and knee pains caused by a spine disk degenerate disease condition" and that he enclosed a copy of an MRI. (*Id.*).

## I.      Investigation of Plaintiff's Sexual Assault Allegation

### 1.      Initiation of the Investigation

On October 17th, Anthony Misercola, a senior investigator in DOCCS's sex crimes unit the Office of Special Investigations[20] ("OSI"), received one of Plaintiff's letters. (Dkt. No. 124-

---

[19] This presumably refers to Samolis.

[20] This entity was formerly called the Office of the Inspector General. (Dkt. No. 126, ¶ 100).

32, at 1; Dkt. No. 103-8, at 21; Dkt. No. 124-33; Dkt. No. 103-29, ¶ 6). Miscerola's duties included conducting investigations under PREA. (Dkt. No. 103-8, at 10).

Oropallo provided a statement dated October 18, 2013, stating that on September 30th Plaintiff never made any statements to him about "allegedly being assaulted or sodomized" but that Plaintiff did report "having chest pains." (Dkt. No. 124-11). Oropallo stated that he notified the medical department and that Plaintiff was "escorted via wheelchair to the infirmary for assessment" and that "approximately 10 minutes later [Plaintiff] was escorted back to the draft area and cleared for his transfer." (*Id.*). Oropallo stated that he interviewed "all named staff in this inmate's complaint and all staff have submitted written responses denying all allegations." (*Id.*).

### 2.    Subsequent Evaluation by Clinton Medical Staff

On October 20th, Miscerola contacted Lieutenant Martin Snow and requested that Plaintiff "be interviewed by a security supervisor and evaluated by medical." (Dkt. No. 124-32, at 1). Medical records and declarations from medical staff reflect that Plaintiff was brought to medical for an examination. (Dkt. No. 126, ¶ 97; Dkt. No. 103-35, ¶ 36; Dkt. No. 124-32, at 1).

Waldron examined Plaintiff and completed an inmate injury report. (Dkt. No. 126, ¶ 97; Dkt. No. 103-35, ¶ 36; Dkt. No. 103-36, at 9–10). She noted that Plaintiff alleged that he was "sexually assaulted and beat up by Upstate officers on 9/30/13" and that he alleged he had "blood [in his] stool and [was] cough[ing] up blood" since September 30, 2013. (Dkt. No. 103-35, ¶¶ 36–37; Dkt. No. 103-3, at 9; Dkt. No. 124-39, at 55). Waldron apparently examined Plaintiff while he was "in shorts" and noted that there was "no visible blood at this time" and that she would have Plaintiff evaluated by a "provider as a follow up – slip given." (Dkt. No. 103-36,

at 9–10). Waldron states that she gave Plaintiff a slip to be seen the next day by Adams.[21] (Dkt. No. 103-35, ¶ 42). An Interdepartmental Communication signed by Waldron to a Lieutenant Matott, dated October 20, 2013, states that at no time "during the draft interview" conducted on September 30th did Plaintiff "tell [Waldron] he was sexually assaulted or beat up by Upstate officers." (Dkt. No. 103-37, at 1).

Plaintiff testified that on October 20th, Waldron did not record all of his symptoms and that she "didn't write anything" except for some writing "in the middle of the page" and that she did not write down everything she observed or that Plaintiff told her. (Dkt. No. 103-2, at 106–08). Plaintiff did not provide specifics as to what Waldron omitted from her description of the alleged sexual assault and beating. (*Id.*).

Plaintiff further testified that he did not have bruising on him that day and that he would not have had bleeding, as he reportedly told Waldron, because he had "changed [his] clothes already." (*Id.* at 108). Plaintiff testified that he "went to see [Adams] on the next day" and that "[t]he doctors" interviewed him through a "phone interpreter" and that he was not given any treatment.[22]

### 3.   Interviews and Review of the Surveillance Footage

On November 5, 2013, Miscercola—with the assistance of an interpreter—interviewed Plaintiff as part of his investigation into Plaintiff's alleged assault. (Dkt. No. 124-32, at 1).[23] According to Miscercola's report, Plaintiff alleged that he was taken "into the ID room in the draft

---

[21] Waldron further testified that if a translation service is used when medically evaluating a prisoner, that would be documented. (Dkt. No. 124-39, at 71). During her deposition, Waldron testified that she could not see anything on the document to indicate that a translator was used. (*Id.* at 72).

[22] No records, including Plaintiff's health services referral history, indicate that Plaintiff was seen by Adams or any provider the next day. (*See* Dkt. No. 103-36, at 12).

[23] Miscercola used an interpreter because Plaintiff said that he does not speak English.  (Dkt. No. 124-32, at 1).

area at Upstate" where he was "beaten by several unknown officers and rendered unconscious." (*Id.*). When Plaintiff "regained consciousness his pants and underwear were around his ankles." (*Id.*). Misercola's report then states that "as a result," Plaintiff was "placed in a wheelchair and taken to medical for evaluation where he reported the alleged assault and sexual assault" and that Plaintiff "claimed his complaint was ignored and he did not receive any medical care." (*Id.*). Following Plaintiff's transfer to Clinton, according to the report, Plaintiff said that he "reported the alleged sexual assault to Officers D. Jock, William Nelson and RN Rebecca Waldren [sic]." (*Id.*). The report appears to note that each of those individuals denied that Plaintiff reported the alleged assault to them. (*Id.*).

The report further states that Plaintiff provided the name of an inmate "as a witness to the alleged sexual and physical assaults." (*Id.*). In addition, the report states that Misercola interviewed several inmates "that were in the same holding cell with inmate Encarnacion" at Upstate." (*Id.* at 2). According to the report, those inmates' statements were "inconsistent with [Plaintiff's] claims." (*Id.*). A witness provided by Plaintiff[24] "denied witnessing any staff physically or sexually assaulting [Plaintiff] in the draft area." (*Id.*). Plaintiff told that inmate "that he was having chest pains and reported that to the sergeant" and, as a result Plaintiff was "taken to medical via wheelchair." (*Id.*). According to the report, the witness stated that Plaintiff "never made any statements about being sexually or physically assaulted." (*Id.*). Misercola interviewed other inmates "assigned to work in Draft"; they "denied witnessing any staff person assaulting any inmate in any way." (*Id.*). Those inmates explained that the draft room is "an open area and there is no way to assault someone without everyone else witnessing it." (*Id.*). Misercola

---

[24] It is unclear whether this is the same inmate witness that Plaintiff provided described previously because the inmate names are redacted. (*See* Dkt. No. 124-32).

reported interviewing all thirteen prison officers, including Ripa and Oropallo, who were in draft on September 30; each denied "physically or sexually assaulting [Plaintiff]."[25] (*Id.*). The report indicates that Misercola reviewed the surveillance footage. (*Id.*).

Misercola testified that on November 5th, Plaintiff provided a pair of white boxers for DNA testing. (Dkt. No. 103-8, at 96, 126). Plaintiff testified that the boxers had blood on them because, according to him, those were the underpants he was "wearing the day of the assault" and that blood got on them because after the assault, "they pull[ed] up [Plaintiff's] pants and underpants." (Dkt. No. 103-2, at 109). According to the forensic report, DNA testing on the boxer shorts revealed the presence of blood and seminal fluid. (Dkt. No. 124-30, at 1–2). Misercola testified at his deposition that the underwear had no "John Doe DNA on them."[26] (Dkt. No. 103-8, at 131–32).

### 4.    The Investigation's Conclusion

Based upon his review of the video and the statements of staff and inmates, Misercola concluded that Plaintiff had not been assaulted by Upstate staff that day. (Dkt. No. 103-29, ¶ 16; Dkt. No. 124-32, at 2). On January 3, 2014, Misercola wrote Plaintiff a misbehavior report "charging him with providing false statements or information to an officer." (Dkt. No. 103-29, ¶ 17; Dkt. No. 124-32, at 2). On January 15th and 16th, a Tier III hearing was held regarding this misbehavior report, and Plaintiff was found guilty. (Dkt. No. 126, ¶¶ 104–05; Dkt. No. 1-1, at 38).

---

[25] It appears Misercola did not interview any of the medical staff at Upstate to whom Plaintiff allegedly first reported the assault. (Dkt. No. 124-32, at 1; *e.g.*, Dkt. No. 103-8, at 25–28, 52, 61, 69–70).

[26] Neither that lab report nor Misercola's notes reflecting the results of that report are in the record.

## IV.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys*, 426 F.3d at 553–54 (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).

## V.       DISCUSSION

### A.       Administrative Exhaustion Regarding the Alleged May 28, 2013 Excessive Force Incident

Defendants argue that Plaintiff's May 28, 2013 excessive force claims against Spinner and Soucia following Plaintiff's disciplinary hearing are subject to dismissal because Plaintiff failed to exhaust his administrative remedies and has failed to establish that administrative remedies were unavailable to him. (Dkt No. 103-41, at 5; Dkt. No. 130, at 7–8). Plaintiff contends that he should be excused from exhaustion because his efforts to do so were stymied, (Dkt. No. 125, at 22–25), and alternatively, that the Court should hold an evidentiary hearing on the issue of exhaustion.[27] (*Id.* at 24).

Under the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983. . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854–55 (2016). "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).

"[T]he PLRA requires 'proper exhaustion,' which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)). Exhaustion "demands compliance with an agency's deadlines and other critical procedural rules." *Id.* (quoting *Woodford*, 548 U.S. at 90). "[U]ntimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's

---

[27] *See generally Messa v. Goord*, 652 F.3d 305, 309 (2d Cir. 2011).

exhaustion requirement." *Id.* (citing *Woodford*, 548 U.S. at 89–90). Exhaustion is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 216 (2007). Thus, Defendants "bear the initial burden of establishing, by pointing to 'legally sufficient source[s]' such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (quoting *Mojias v. Johnson*, 351 F.3d 606, 610 (2d Cir. 2003)). "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then 'counter' the defendant's assertion by showing exhaustion [or] unavailability" under *Ross*. *Ferrer v. Racette*, No. 14-cv-1370, 2017 WL 6459525, at *12, 2017 U.S. Dist. LEXIS 206983, at *35 (N.D.N.Y. Dec. 18, 2017) (citation omitted).

In *Ross*, the Supreme Court explained that:

[t]he exhaustion requirement hinges on the "availabl[ity]" of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones. . . . [A]n inmate is required to exhaust those, but only those, grievance procedures that are "capable of use" to obtain "some relief for the action complained of."

136 S. Ct. at 1858–59 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)) (citations omitted).

In *Ross*, the Supreme Court highlighted "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Williams v. Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (quoting *Ross*, 136 S. Ct. at 1859). First, "an administrative remedy may be unavailable when 'it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates.'" *Id.* (quoting *Ross*, 136 S. Ct. at 1859). Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* at 123–24 (quoting *Ross*, 136 S. Ct. at 1859). Third, an administrative remedy may be unavailable "when prison administrators thwart

inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 124 (quoting *Ross*, 136 S. Ct. at 1860).

In support of their motion, Defendants submit declarations from grievance coordinators, which describe DOCCS's administrative exhaustion process. (Dkt. No. 103-13, at 1–3; Dkt. No. 103-16, at 2–3; Dkt. No. 103-20, at 2–3). Each grievance coordinator states that Plaintiff never filed a grievance for the May 28, 2013 use-of-force incident, (Dkt. No. 103-13, ¶ 20; Dkt. No. 103-20, ¶¶ 13–18), including while Plaintiff was temporarily held at Attica. (Dkt. No. 103-16, ¶¶ 14–20; Dkt. No. 103-20, ¶¶ 13–18). *See* 7 N.Y.C.R.R. § 701.5(a) (explaining that to initiate the exhaustion process, an "inmate must submit a complaint to the clerk within 21 calendar days of an alleged occurrence on an inmate grievance complaint form"). Defendants also submit a document showing Plaintiff's extensive grievance-filing history. (Dkt. No. 103-21). With these submissions, Defendants have met their initial burden. *Hubbs*, 788 F.3d at 59; *see also Bennett v. Onua*, No. 09-cv-7227, 2010 WL 2159199, at *3, 2010 U.S. Dist. LEXIS 51986, at *9–10 (S.D.N.Y. May 26, 2010) (finding that the defendants "adequately supported the affirmative defense of failure to exhaust" where "a search of the grievance log records . . . did not reveal any record of a grievance" filed by the plaintiff).

The burden shifts to Plaintiff to establish that remedies were unavailable to him. Plaintiff argues that he filed a grievance, but his grievance was ignored. (Dkt. No. 125, at 24–25). For support, Plaintiff cites his deposition testimony that he submitted a grievance about the May 28th incident while in the SHU. (Dkt. No. 103-2, at 55, 58). After sustained questioning on the issue, however, Plaintiff testified that he "always [files grievances] but in this situation not sure. My first intention was to receive medical attention." (*Id.* at 68). Then, when asked whether it was possible he did not file a grievance over this incident, Plaintiff responded, "That's not correct. I

always report." (*Id.*). Plaintiff was also shown a grievance filed on June 11th, (Dkt. No. 103-15; Dkt. No. 103-21, at 2), and dated May 29, 2013 (the day after the alleged assault), relating to a separate incident that allegedly took place on May 12th in which Plaintiff makes no mention of the alleged May 28th incident. (Dkt. No. 103-2, at 61–62). Plaintiff testified that he did not recall receiving a response to his grievance, and that "they always throw it away, dump it when it's a kind of complaint like this." (*Id.* at 67).

Plaintiff's evidence is insufficient to withstand summary judgment. "[M]ere threadbare allegations that [Plaintiff's] grievances were intercepted and discarded, without evidence to support such allegation, including any evidence that identifies which defendant, in particular, is responsible for discarding the grievances" are insufficient to create a dispute of fact as to whether Plaintiff exhausted his administrative remedies. *See Belile v. Griffin*, No. 11-cv-0092, 2013 WL 1776086, at *8, 2013 U.S. Dist. LEXIS 47137, at *26–27 (N.D.N.Y. Feb. 12, 2013), *report and recommendation adopted*, 2013 WL 1291720, 2013 U.S. Dist. LEXIS 43217 (N.D.N.Y. Mar. 27, 2013). Here, Plaintiff does not offer evidence beyond his conclusory testimony to show that he filed a grievance or that anyone tampered with his grievance. *Veloz v. New York*, 339 F. Supp. 2d 505, 514 (S.D.N.Y. 2004) ("Even assuming [the plaintiff] did submit grievances, he offers no evidence that any particular officer thwarted his attempts to file."). When Plaintiff testified to this allegation and was asked to name who would discard his grievances, he referred to those "who receive the letters and who read the letters." (Dkt. No. 103-2, at 57). *See Nunez v. Goord*, 172 F. Supp. 2d 417, 428–29 (S.D.N.Y. 2001) (granting summary judgment where the plaintiff alleged, in the alternative, that his failure to file grievances was due to "the practice of certain officers" to destroy them or that they were "lost at the Grievances Committee Office" without evidentiary support). Moreover, Plaintiff *did* mention the alleged

May 28th incident in his subsequent July 23rd grievance, (Dkt. No. 103-19, at 4; Dkt. No. 103-16, ¶¶ 15–16), at which point the allegations stemming from the alleged May incident were denied as untimely. (Dkt. No. 103-22, at 1).

Finally, Plaintiff points to letters Plaintiff sent to various individuals, including the DOCCS Commissioner, regarding the alleged May 28th incident. (Dkt. No. 125, at 25 (citing Dkt. No. 124-22)). Plaintiff's argument is unavailing and fails to create a genuine material dispute of fact as to whether he properly exhausted and complied with DOCCS's "deadlines and other critical procedural rules." *Woodford*, 548 U.S. 81 at 90. At summary judgment the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*, 475 U.S. at 586. Because Plaintiff has failed to raise a genuine dispute of fact as to whether he exhausted his administrative remedies, his request for an evidentiary hearing is denied. The Court grants summary judgment on Plaintiff's Eighth Amendment claim against Spinner and Soucia for the alleged May 28th use of force incident.

### B.   Procedural Due Process

Defendants move for summary judgment on Plaintiff's procedural due process claim against Spinner, stemming from Plaintiff's May 2013 Tier II hearing regarding the scratched cell window, arguing that the sentence imposed did not implicate a protected liberty interest and that, even if it did, Plaintiff received due process. (Dkt. No. 103-41, at 7–16). Finally, Defendants argue that even if Plaintiff's procedural due process rights were violated, they are entitled to qualified immunity. (*Id.* at 16).

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "A liberty interest may arise from the Constitution itself, . . . or it may arise from an expectation or interest created by state laws or polices." *Wilkinson v. Austin*, 545 U.S.

209, 221 (2005) (citation omitted). "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as . . . special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

As a preliminary matter, Plaintiff had "'no right to due process [at his hearing] unless a liberty interest' was infringed." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (alteration in original) (quoting *Scott v. Albury*, 156 F.3d 283, 287 (2d Cir. 1998) (per curiam)). "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Palmer*, 364 F.3d at 64 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'" *Palmer*, 364 F.3d at 64 (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998)). There is no "bright-line rule as to how lengthy a SHU confinement will be considered atypical and significant." *Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000).

### 1.    Sentence Aggregation

It is undisputed that Plaintiff spent at least 122 consecutive days in SHU confinement following the May 2013 hearing.[28] (Dkt. No. 124-6; 130-1, ¶ 11). However, a majority of that sentence stemmed from Spinner's decision to reinstate a prior, unrelated three-month

---

[28] Plaintiff asserts that he served 126 consecutive days in the SHU. (Dkt. No. 103-2, at 114).

disciplinary sentence that had been suspended. Defendants maintain that the sentences should not be aggregated because: (1) the sentences were imposed by different hearing officers and (2) the hearings related to "completely separate offenses and were conducted at different facilities." (Dkt. No. 103-41, at 9). Plaintiff contends that courts aggregate sentences "even if the hearing officer was not responsible for imposing the previous SHU sentence." (Dkt. No. 125, at 29).

The Second Circuit has "suggested" that "separate SHU sentences 'should be aggregated for purposes of the *Sandin* inquiry' when they constitute a sustained period of confinement." *Giano v. Selsky*, 238 F.3d 223, 226 (2d Cir. 2001) (quoting *Sims*, 230 F.3d at 23); *see also Sealey v. Giltner*, 197 F.3d 578, 587 (2d Cir. 1999) (finding an officer responsible for 101 aggregated days that a prisoner was confined in SHU even though the officer had only assigned the prisoner to 83 days in SHU); *Gibson v. Rosati*, No. 13-cv-00503, 2017 WL 1534891, at *10–11, 2017 U.S. Dist. LEXIS 35524, at *26 (N.D.N.Y. Mar. 10, 2017) (citing, inter alia, *Giano*, *Sims*, and *Sealy* to reject the defendants' argument that the plaintiff's "sentences should not be considered in the aggregate" because each sentence "stemmed from an unrelated disciplinary hearing involving separate incidents") (quotation marks omitted); *Bunting v. Nagy*, 452 F. Supp. 2d 447, 457 (S.D.N.Y. 2006) (aggregating three sentences, each from unrelated incidents, that resulted in 365 days of consecutive keeplock confinement).

In this case, after finding Plaintiff guilty on May 28, 2013, Defendant Spinner invoked Plaintiff's December 19, 2012 suspended sentence, which included three months of SHU confinement, and imposed an additional sentence, which included thirty days of keeplock. (Dkt. No. 126, ¶¶ 43-44). In accord with this determination, Plaintiff was to serve his three-months SHU time, and then his thirty-days in keeplock. There is no suggestion that this was not a

sustained period of confinement. Thus, the Court finds it appropriate to aggregate Plaintiff's confinement in the SHU to the 122 days that Plaintiff served.

### 2. *Sandin* Inquiry

Next, the Court must consider whether Plaintiff's SHU confinement constituted an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Palmer*, 364 F.3d at 64 (quoting *Sandin*, 515 U.S. at 484). Defendants limit their liberty interest argument to the 30-day keeplock sentence. (Dkt. No. 103-41, at 9–10). Plaintiff argues that "[c]onfinements . . . such as Mr. Encarnacion's sentence, have been found to implicate a constitutionally protected liberty interest." (Dkt. No. 125, at 28). Under Second Circuit caselaw, confinement between "101 and 305 days" qualifies as an "intermediate duration" that requires "'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions." *Palmer*, 364 F.3d at 65 (quoting *Colon v. Howard*, 215 F.3d 227, 232 (2d Cir. 2000)).

Plaintiff testified to the following conditions during his time in the SHU. Sometimes the toilet and sink in his cell did not work because the guards would turn the water on "as they please[d]," (Dkt. No. 103-2, at 114–15), although most of the time the water was turned on. (*Id.* at 115). He was permitted showers "[t]wice a week" but that there were weeks during which he was only permitted to shower once. (*Id.* at 119). Plaintiff did not indicate how many weeks he was only able to shower once. Plaintiff testified that he generally remained in his cell for 23 hours per day with one hour for recreation; however, at the same time Plaintiff testified that he was denied his one hour of recreation time the "majority of the time that [he] was" in the SHU. (*Id.* at 115–116). *See Ortiz v. McBride*, 380 F.3d 649, 655 (2d Cir. 2004) (finding allegations that the plaintiff, "for at least part of his confinement, . . . was kept in SHU for twenty-four hours a day, was not permitted an hour of daily exercise, and was prevented from showering '*for weeks*

*at a time*' . . . could establish conditions in SHU 'far inferior,' to those prevailing in the prison in general" (quoting *Palmer*, 364 F.3d at 66)) (emphasis added).

Plaintiff testified that the officers who delivered his food "spit on [his] meals." (Dkt. No. 103-2, at 118). Plaintiff testified that, "[a]t times," instead of a meal, he was just given an empty plate. (*Id.* at 118). When asked how many times he was "denied meals," Plaintiff testified "many times, lots of times," and then when asked if he was given "no meal," he testified that he would eat only "the fruit or whatever [on the plate] was sealed" because there was spit on the "food that was open." (*Id.* at 118–119). *Headley v. Fisher*, No. 06-cv-6331, 2010 WL 2595091, at *4, 2010 U.S. Dist. LEXIS 63836, at *10 (S.D.N.Y. June 28, 2010) ("[U]nder certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." (quoting *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983)). Plaintiff also stated that he was not permitted to have a comb or shaving cream in his cell. (Dkt. No. 103-2, at 119). *Palmer*, 364 F.3d at 66 (considering plaintiff's assertion that he was denied, inter alia, hygienic products in the *Sandin* analysis).[29]

Defendants argue that Plaintiff's conclusory allegations are insufficient to establish an atypical or significant hardship. (Dkt. No. 130, at 9). While Plaintiff's allegations are, at times, conclusory and inconsistent, Defendants have not contradicted or otherwise addressed these allegations. Recognizing that "[d]isputes about conditions may not be resolved on summary judgment," and construing the evidence in the light most favorable to the Plaintiff, the Court finds that he has raised genuine questions of material fact as to whether the conditions he

---

[29] The parties have not addressed the comparability of these conditions to the normal conditions of SHU confinement, the general population, or administrative confinement. *Kalwasinski v. Morse*, 201 F.3d 103, 107 n.6 (2d Cir. 1999); *see also, e.g.,* N.Y. Comp. Codes R. & Regs. Tit. 7, § 302.2(c) (listing "plastic comb" as one of the "toilet articles" to be provided inmates in SHU; *id.*, at § 303 (providing that shaving cream will be "issued only during shower").

experienced in SHU confinement constituted "an atypical and significant hardship." *Palmer*, 364

F.3d at 65 (citing *Wright*, 132 F.3d at 137–38).

### 3.    Adequate Process

Defendants argue that Spinner is entitled to summary judgment because he satisfied the

requirements of procedural due process. (Dkt. No. 103-41, at 10–16). "Although prison inmates

necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled

to certain procedural protections when disciplinary actions subject them to further liberty

deprivations such as . . . special confinement that imposes an atypical hardship." *Sira v. Morton*,

380 F.3d 57, 69 (2d Cir. 2004); *see also Wolff v. McDonnell*, 418 U.S. 539, 555–56, (1974). An

inmate is entitled to (1) "advance written notice of the charges against him"; (2) "a hearing

affording him a reasonable opportunity to call witnesses and present documentary evidence"; (3)

a fair and impartial hearing officer"; and (4) "a written statement of the disposition, including the

evidence relied upon and the reasons for the disciplinary actions taken." *Sira*, 380 F.3d at 69.

Here, Plaintiff alleges three due process violations during his May 2013 hearing;

specifically, Plaintiff alleges that (1) he was "not given assistance," (2) he was denied the right to

call witnesses, (3) he was denied the opportunity to present rebuttal evidence, and (4) Spinner

was "clearly biased." (Dkt. No. 125, at 31). The Court considers each contention.

### a.    Assistance and Opportunity to Call a Witness

There is no right to counsel at a disciplinary hearing, and "an inmate's right to assistance

is limited." *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993). The Second Circuit has, however,

"held . . . that in certain circumstances an inmate will be unable to 'marshal evidence and present

a defense,' without some assistance." *Id.* (quoting *Eng v. Coughlin*, 858 F.2d 889, 898 (2d Cir.

1988)). For example, the "inmate might be illiterate, confined to . . . SHU, or unable to grasp the

complexity of the issues." *Id.* In such circumstances, "an assistant must be assigned to the inmate

to act as his *surrogate*—to do what the inmate would have done were he able." *Id.* "[A]ny violations of this qualified right are reviewed for 'harmless error.'" *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009) (quoting *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991)).

There is no allegation that an assistant was necessary due to illiteracy, confinement in SHU, or complexity of the issues. Defendants argue that Plaintiff was provided "adequate assistance during his Tier II hearing." (Dkt. No. 103-41, at 11). First, they note that Plaintiff did not "specifically request an assistant or object that he was not provided an assistant before the hearing." (*Id.*). Second, they note that Plaintiff was provided a "Spanish-speaking interpreter who was present during all testimony and acted as [Plaintiff's] assistant throughout the hearing by, *inter alia*, requesting witnesses and documents on Plaintiff's behalf and translating." (*Id.*). Although Plaintiff testified in his deposition that he requested an assistant, (Dkt. No. 103-2, at 110), he did not state when he made that request or cite to any record evidence reflecting any such request. Plaintiff did not appear to make any such request during the hearing, or raise any objection based on a failure to provide an assistant when he was repeatedly asked if he had any procedural objections. (*See* Dkt. No. 124-4).

The parties dispute Plaintiff's proficiency in English. Although Spinner states that Plaintiff did not need an assistant because Plaintiff "understood English," Plaintiff has adduced evidence indicating that speaks very little English. *See Powell v. Ward*, 487 F. Supp. 917, 932 (S.D.N.Y. 1980) ("Unless Spanish speaking inmates understand and can communicate with the hearing board, they are being denied the due process protections guaranteed in *Wolff*."). While Plaintiff had a Spanish-speaking interpreter at the hearing, Plaintiff asserts that he was not provided with a meaningful opportunity to call a witness. Plaintiff testified that he sought to call the prisoner who had occupied the cell at issue prior to Plaintiff, to testify that the "damage on

the window was there before while he was living in that cell [and] [that inmate] had submitted a complaint to be fixed." (Dkt. No. 103-2, at 111).

A prisoner "facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566. However, "[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence. *Id.* It is well settled that an official may refuse to call witnesses as long as the refusal is justifiable. *Scott v. Kelly*, 962 F.2d 145, 146 (2d Cir. 1992) "[A] prisoner's request for a witness can be denied on the basis of irrelevance or lack of necessity." *Id.* at 147 (quoting *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991)). If a prisoner "would have been found guilty . . . and confined to SHU even if his witnesses had been called, his confinement in SHU must be considered a justified deprivation of liberty, not a deprivation caused by the State's failure to permit him to call those witnesses." *Patterson v. Coughlin*, 905 F.2d 564, 568 (2d Cir. 1990). "The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but upon the official to prove the rationality of the position." *Kingsley*, 937 F.2d at 30–31.

On this record, assuming, as Plaintiff asserts, that he speaks little English, and construing the evidence in the light most favorable to Plaintiff, he has raised a question of fact as to whether the interpreter's assistance was sufficient to effect Plaintiff's right to call witnesses. Based on the transcript of the hearing, it is not apparent whether the interpreter made clear to Spinner that Plaintiff wanted the prior occupant of cell, who presumably would have had firsthand knowledge

34

of the cell's condition, to testify regarding the condition of the cell window. (*See* Dkt. No. 124-4, at 7, 12).

At the hearing, the interpreter told Spinner that Plaintiff wanted to call a witness. (Dkt. No. 124-4, at 6). The transcript then reflects the following conversation between Spinner and Plaintiff, as translated by the interpreter: When Spinner asked, "what's [the witness] going to testify to?" Plaintiff said, "he was confined in that cell and he knows it was the last (inaudible)." (*Id.* at 7). Spinner then asked, "what was inside the cell," and Plaintiff (without the interpreter) said, "mirror." (*Id.*) Spinner responded, "[t]he mirror? We are not talking about a mirror," and denied the witness. (*Id.*). Later during the hearing, when Spinner asked whether Plaintiff had "[a]ny other defense or witnesses," Plaintiff said, "No you denying the witness he is (inaudible)." (*Id.* at 10). Plaintiff then requested the "video of when he moved to the cell," and moments later said he would "just assume [sic] have the witness." (*Id.* 10–11). Plaintiff said "[w]ants to know how the window's scratched" and "wants to know about the mirror inside the cell." (*Id.* at 11– 12). When Spinner again explained that he is "not here for a mirror," Plaintiff said that both "had a scratch." (*Id.* at 12). Spinner then responded: "Well at this point the only thing I know about is the window and that's why we are here." (*Id.*). Spinner then denied Plaintiff's witness request, explaining that the witness "would have no relevant testimony to the cell window." (*Id.*).

Here, according to Plaintiff, the witness he requested was directly relevant to Plaintiff's claim that the allegation against him was false because the cell window was scratched when he moved in. (Dkt. No. 103-2, at 111). *See Kelly*, 962 F.2d at 147. While a scratch to a mirror inside the cell was not relevant, a scratch on the window would have been relevant. Viewing all of the evidence in the light most favorable to the Plaintiff, the Court finds that Plaintiff has raised a

material issue of fact on his due process claim with respect to assistance and the opportunity to call a witness.[30] Thus, summary judgment is denied on this issue.

### b.     Bias

"An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996). An impartial hearing officer "is one who does not prejudge the evidence and who cannot say . . . how he would assess evidence he has not yet seen." *Patterson*, 905 F.2d at 569–70.

Plaintiff asserts that Spinner's bias "is evident from even a cursory review" of the hearing transcript. (Dkt. No. 125, at 37). The Court disagrees. There is no evidence to suggest that Spinner "decide[d] the disposition of [Plaintiff's hearing] before it was heard." *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) (citing *Crooks v. Warne*, 516 F.2d 837, 840 (2d Cir. 1975)). It appears that Spinner decided the case based on the evidence that was presented at the hearing—Officer Schrader's testimony, her written report, the cell inspection sheet signed by Plaintiff, and photos of the cell showing the scratches. (Dkt. No. 124-4, at 25; Dkt. No. 103-23, ¶ 40). The hearing transcript does not reflect a lack of impartiality. Thus, summary judgment is granted on Plaintiff's due process claim alleging Spinner's bias.

---

[30] Plaintiff also argues that during his Tier II hearing he "requested copies of the cell inspection manual." (Dkt. No. 125, at 38). However, when Spinner asked Plaintiff what manual he was requesting, Plaintiff responded, according to the interpreter, that he was requesting a manual "[f]or inspection cells." (Dkt. No. 124-4, at 8). Plaintiff then asserts, without evidentiary support, that the manual "could have revealed prior inspections that showed scratches on the window." (Dkt. No. 125, at 38). Defendants argue that no such manual exists. (Dkt. No. 103-41, at 12). Further, according to the hearing transcript, it appears Plaintiff was provided with a copy of the "cell inventory checklist" albeit in English. (Dkt. No. 124-4, at 8). In any event, this argument is unavailing. *See Rodriguez v. Lindsay*, No. 09-cv-2915, 2011 WL 2601448, at *4, 2011 U.S. Dist. LEXIS 70505, at *10 (E.D.N.Y. June 30, 2011), *aff'd*, 498 F. App"x 70 (2d Cir. 2012) ("The Court has found no authority for the proposition that an inmate is entitled, as a matter of course, to physical or documentary evidence in defending against prison disciplinary charges.").

### 4.     Qualified Immunity

Defendants argue that, even if Spinner violated Plaintiff's Fourteenth Amendment rights, he is nevertheless entitled to qualified immunity. (Dkt. No. 103-41, at 16). Plaintiff does not respond to this argument apart from passing references in the standard of review section and when discussing Plaintiff's September 30th assault claim. (*See* Dkt. No. 125, at 13, 15–16; *see also* Dkt. No. 130, at 10 (noting that Plaintiff "offered no opposition to [D]efendants' qualified immunity argument")).

"Qualified immunity is an affirmative defense on which the defendant has the burden of proof." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). Defendants devote one parenthetical citation to their qualified immunity argument, stating that "that qualified immunity protects a hearing officer who could reasonably conclude that some evidence supports that officer's prison disciplinary determination." (Dkt. No. 103-41, at 16 (citing *Zavaro v. Coughlin*, 970 F.2d 1148, 1152 (2d Cir. 1992)). The Court disagrees. In *Zavaro*, the court "conclude[d] that [an] inmate's right not to be adjudicated guilty without some evidence to support that finding was clearly established by 1988." 970 F.2d at 1152. Here, however, Plaintiff has not challenged the lack of evidence; he asserts that he was denied the opportunity to call a witness. *Zavaro* does not protect a hearing officer from § 1983 liability whenever "some evidence supports" the guilty determination. Accordingly, the Court rejects this argument.

### C.     Excessive Force and Sexual Assault – September 30, 2013

Defendants argue that summary judgment is proper on Plaintiff's excessive force claim against Ripa because "nothing in the record" supports Plaintiff's allegations that he was subjected to excessive force and sexually assaulted on September 30, 2013, "aside from the plaintiff's own contradictory and incomplete testimony" such that "no reasonable person" could credit Plaintiff's testimony. (Dkt. No. 103-41, at 17 (quoting *Jeffreys v. City of New York*, 426

F.3d 549, 554 (2d Cir. 2005))). Plaintiff responds that the credibility dispute between Plaintiff

and Ripa "alone justifies" denying summary judgment. (Dkt. No. 125, at 17). In addition,

Plaintiff notes that "a range of circumstantial evidence" supports his claim. (*Id.*).

When a prisoner claims "that he was subjected to excessive force by prison employees,

the source of the ban against such force is the Eighth Amendment's ban on cruel and unusual

punishments." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009). "A claim of cruel and unusual

punishment in violation of the Eighth Amendment has two components—one subjective,

focusing on the defendant's motive for his conduct, and the other objective, focusing on the

conduct's effect." *Id.*; *see also Hudson v. McMillian*, 503 U.S. 1, 7–8 (1992). "The subjective

component . . .  requires a showing that the defendant 'had the necessary level of culpability,

shown by actions characterized by wantonness' in light of the particular circumstances

surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (internal quotation marks omitted)

(quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). "When prison officials are

accused of using excessive force, the 'wantonness' issue turns on 'whether force was applied in a

good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause

harm.'" *Id.* (quoting *Hudson*, 503 U.S. at 7). "The objective component of a claim of cruel and

unusual punishment focuses on the harm done, in light of 'contemporary standards of decency.'"

*Id.* (quoting *Hudson*, 503 U.S. at 8).

In *Jeffreys*, the Second Circuit explained that, while there were many "material issues of

fact," the "inquiry focuse[d] on whether . . . upon review of the record as a whole" those material

disputes were "*genuine.*" 426 F.3d at 554. That is, "even after drawing inferences in the light

most favorable to [the plaintiff], no reasonable jury could have issued a verdict in his favor." *Id.*

There, the court held that summary judgment was proper where the plaintiff's testimony  "was

largely unsubstantiated by any other direct evidence" and "so replete with inconsistencies and improbabilities" such that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *See id.* at 555.

### 1. Evidence Beyond Plaintiff's Testimony

Plaintiff contends that the following evidence supports his allegation: (1) the two witness statements submitted in the course of the investigation into Plaintiff's alleged assault; (2) the letters dated October 10th that Plaintiff wrote to various officials; (3) the absence of medical records memorializing Plaintiff's visit to Upstate; and (4) a forensic report that detected blood on Plaintiff's underwear. As set forth below, the Court finds that Plaintiff's testimony is largely unsubstantiated.

### a. The Witness Statements

Plaintiff points to statements provided by two prisoners in the course of the investigation in Plaintiff's alleged assault. (Dkt. Nos. 124-20, 124-21). The first witness "couldn't see into the ID room" and did not "see anyone assault or sexually assault" Plaintiff. (Dkt. No. 124-20, at 1, 3). He stated that he heard a "commotion" while Plaintiff was in the ID room and that Plaintiff returned complaining of pain in his ribs and chest. (*Id.* at 1). However, in the surveillance video, there appears to be no sign of any commotion—and no reaction to that effect from the officers milling around the draft room or the prisoners in the holding cell next to the ID room—while Plaintiff is in the ID room.[31] (Dkt. No. 103-9, 06:27:18-06:28:47).

While the second witness testified that he saw an officer, whom he could not identify, "swing his arm" and that he "assume[d] that [the officer] was hitting" Plaintiff, (Dkt. No. 124-21, at 2), the witness's description of how he could have been in a position to see that is not

---

[31] While Plaintiff is in the ID room, a cart rolls into the table in the middle of the draft room. (Dkt. No. 103-9, 6:28:06). The video does not have sound, so it is impossible to assess how loud of a sound that made.

consistent with the video. The witness stated that "when [Plaintiff] was done in the ID room he came into the holding cell I was in." (Dkt. No. 124-21, at 2). The video makes clear, however, that after Plaintiff exited the ID room, he was placed in the holding cell next to the ID room and that from there, the witness could not have seen into the ID room.[32]

### b.  Medical Records

Plaintiff cites to the absence of medical records reflecting Plaintiff's undisputed trip to the medical unit at Upstate as evidence that Plaintiff's "efforts to report his sexual assault were not taken seriously by anyone at DOCCS." (Dkt. No. 125, at 18–19; Dkt. No. 103-9; Dkt. No. 130-1, ¶¶ 15–16). However, it would be a stretch to find that the absence of a medical record memorializing this ten-minute visit during which he apparently was cleared for transport to Clinton, supports Plaintiff's allegation of a sexual assault.

### c.  Plaintiff's Letters Dated October 10, 2013

Plaintiff further argues that "there is no question that [Plaintiff] complained about" the September 30th assault, pointing to the letters dated October 10, 2013 that Plaintiff sent to various officials. (Dkt. No. 125). While these letters document Plaintiff's complaint, they do not contain evidence beyond the Plaintiff's own claims.

### d.  Forensic Report

Plaintiff also points to the forensic report that showed traces of blood and seminal fluid in his underwear. (Dkt. No. 125, at 20; Dkt. No. 124-30, at 1–2). Miscercola collected the underwear

---

[32] The witness's description is not consistent with the video in several additional respects. First, the witness described that, after his own strip frisk, he was placed in the holding cell "*across* from" Plaintiff and that, at this point, Plaintiff was "in a cell right next to the ID room." (Dkt. No. 124-21, at 1) (emphasis added). However, the surveillance video shows that once prisoners exited the strip frisk room, they were placed in the holding cell *next to* the ID room. (*See generally* Dkt. No. 103-9). And, contrary to the witness's statement, Plaintiff was not taken into the ID room from the cell *next to* the ID room; he entered the ID room from the strip frisk room. (Dkt. No. 103-9). Finally, the witness stated that Plaintiff was in the ID room for "about fifteen minutes," but the video shows that Plaintiff was in the ID room for approximately 90 seconds. (*Compare* Dkt. No. 124-21, at 2 *with* Dkt. No. 103-9, 06:27:16-06:28:49).

as part of his investigation. (Dkt. No. 103-8, at 126). However, the only evidence suggesting that Plaintiff was actually wearing that underwear on the day of the assault comes from Plaintiff's own deposition testimony. (Dkt. No. 103-2, at 109). Furthermore, Defendants note—and Plaintiff does not dispute—that the results of the DNA test showed "no John Doe DNA on them." (Dkt. No. 103-8, at 132).

### 2. Plaintiff's Testimony

Next, the Court must decide whether Plaintiff's testimony is "so replete with inconsistencies and improbabilities" such that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Jeffreys*, 426 F.3d at 555. The Court finds that it is, for several reasons.

First, as Defendants note, Plaintiff claims that he was struck once in the stomach, "fell down to the floor unconscious," and that when he "recovered consciousness" he had his pants and underwear "by [his] knees," was "picked up" by Ripa and another officer who also "pick[ed] up [his] pants, felt wetness and "pain in [his] anus," and that he then walked out of the ID room—all in the span of approximately 90 seconds. (Dkt. No. 103-2, at 72–82; Dkt. No. 103-9, 06:27:16–06:28:49). It is highly unlikely that this series of events occurred in such a short span of time.

Plaintiff further testified that all the inmates in the draft room "saw everything" and told Plaintiff "what happened." (Dkt. No. 103-2, at 82). This is inconsistent with the witness statements provided by Plaintiff, neither of which supports that assertion. (Dkt. No. 124-20, at 1).

Plaintiff further testified that staff and other prisoners could see the assault occur because the door to the ID room was open. (Dkt. No. 103-2, at 83, 89). Indeed, the surveillance video appears to show that the door to the ID room was open when Plaintiff was inside, as it appears that movement from within the ID room is visible. (Dkt. No. 103-9, 06: 28:16). This, however, only adds to the improbability of Plaintiff's account. No one in the draft room, including officers standing just a few

feet from the ID room's entrance, appear to react to an assault. (*Id.*).[33] The casual pace of the officers moving throughout the draft room does not change while Plaintiff is in the ID room, or while Plaintiff is moved from the ID room to the holding cell. Furthermore, as Defendants also note, Plaintiff exhibits no sign of injury after he exits the ID room. (*Id.* at 06:28:49). He similarly exhibits no sign of injury as he later walks to the holding cell across from the ID room. (*Id.* at 06:50:23).

Plaintiff's assertion that he reported a sexual assault upon arriving at Clinton is inconsistent with all of the contemporaneous records at Clinton that day, including the medical record of his visit to the emergency room, (Dkt. No. 103-34, at 5), the medical record from his evaluation later that day, (*id.* at 1), the health screening form documenting his "current health problem[s] or complaint[s]," (*id.* at 3), and the initial screening interview, (Dkt. No. 103-39), none of which reflects that Plaintiff reported either an assault or any of the injuries he attributes to the assault.

Plaintiff contends that the video does not "capture what happened in the minutes that [Plaintiff and Ripa] were in the identification room." (Dkt. No. 125, at 17). To be sure, the video does not show much of what occurred inside the ID room; nevertheless, the Court finds that even drawing all inferences in Plaintiff's favor, in light of the video evidence and the inconsistencies and contradictions in Plaintiff's version of the events, no reasonable person could credit Plaintiff's allegation of assault. *Jeffreys*, 426 F.3d at 555. "[V]iewing the video footage together with the other evidence, no reasonable fact-finder could conclude that [Ripa] used [excessive] force" against Plaintiff. *McKinney v. Dzurenda*, 555 F. App'x 110, 111–12 (2d Cir. 2014)

---

[33] The Court notes that the Defendants and non-party witnesses all deny that they saw any assault or that Plaintiff contemporaneously reported that he had been assaulted. That includes evidence submitted by Samolis, (Dkt. No. 103-38, ¶ 15), Oropoallo, (Dkt. No. 124-11; Dkt. No. 103-32, ¶ 21), Ripa, (Dkt. No. 124-38, at 67–68), non-party witness Sergeant Gill (Dkt. No. 124-36, at 31–32), and the numerous officials and prisoners who were in the draft room that Misercola interviewed in the course of his investigation. (Dkt. No. 124-32, at 2).

(affirming summary judgment in an excessive force case based upon video evidence); *Scott v. Harris*, 550 U.S. 372, 380 (2007) (reversing a denial of summary judgment where a "videotape quite clearly contradict[ed] the version of the story told by respondent and adopted by the Court of Appeals"); *Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). Accordingly, summary judgment is granted to Ripa on Plaintiff's Eighth Amendment excessive force claim as to the alleged September 30, 2013 assault.

### D.      Failure to Intervene Against Defendant Oropallo

Defendants argue that because Plaintiff fails to establish an underlying constitutional violation—his Eighth Amendment excessive force claim against Ripa—his claim against Oropallo fails as a matter of law. (Dkt. No. 103-41, at 20). The Court agrees.

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *Kee v. Hasty*, No. 01-cv-2123, 2004 WL 807071, at *26, 2004 U.S. Dist. LEXIS 6385, at *86 (S.D.N.Y. Apr. 14, 2004). For Plaintiff to succeed on his failure to intervene claim, he must show that the officer (1) "observe[d] or ha[d] reason to know" that "excessive force [wa]s being used" and that (2) the officer had "a realistic opportunity to intervene to prevent the harm from occurring." *Branen*, 17 F.3d at 557.

As the Court has concluded that no reasonable factfinder could conclude that Plaintiff was subjected to excessive force on September 30, 2013, his failure to intervene claim against Oropallo necessarily fails. *Simcoe v. Gray*, 670 F. App'x 725, 727 (2d Cir. 2016) ("[A]bsent a

constitutional violation on the part of any of the officers, [the plaintiff's] failure-to-intervene claim necessarily fails."); *see also Addona v. D'Andrea*, 692 F. App'x 76, 78 n.2 (2d Cir. 2017) ("Because we conclude that the force used was not unreasonable, there was no constitutional violation, and the District Court correctly granted summary judgment on the plaintiff's failure to intervene claim."); *Jackson v. Vill. of Ilion*, No. 6:14-cv-563, 2016 WL 126392, at *8, 2016 U.S. Dist. LEXIS 2794, at *23 (N.D.N.Y. Jan. 11, 2016) (dismissing the plaintiff's failure to intervene claim where "no reasonable juror could conclude" that two individual defendant officers "violated plaintiff's federal constitutional rights"). Thus, summary judgment is granted on Plaintiff's failure to intervene claim against Oropallo.

### E.   Retaliation

To establish a First Amendment retaliation claim, the plaintiff must demonstrate: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)). In the prison context, "adverse action" is conduct "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003). This inquiry must be "tailored to the different circumstances in which retaliation claims arise," bearing in mind that "[p]risoners may be required to tolerate more . . . than average citizens, before a [retaliatory] action taken against them is considered adverse." *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

"Once the plaintiff carries his initial burden, 'the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff even in the absence of the protected conduct.'" *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) (quoting

*Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (internal quotation marks omitted)).

Because of "the near inevitability of decisions and actions by prison officials to which prisoners

will take exception and the ease with which claims of retaliation may be fabricated," prisoners'

claims of retaliation are examined with "skepticism and particular care." *Colon v. Coughlin*, 58

F.3d 865, 872 (2d Cir. 1995) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983),

*overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

### 1.    Defendant Ripa

Defendants argue that summary judgment on Plaintiff's claim that Ripa subjected him to

excessive force and sexual assault in retaliation for Plaintiff's filing of grievances against him is

warranted because no reasonable jury could find that Ripa sexually assaulted Plaintiff and

"[t]hus, plaintiff has failed to demonstrate any adverse action by Ripa." (Dkt. No. 103-41, at 21).

The Court agrees. As the Court has concluded that no reasonable factfinder could conclude that

Plaintiff was assaulted by Ripa on September 30th, Plaintiff's retaliation claim necessarily fails

because he cannot show that he was subject to adverse action. *See Smolen v. Dildine*, No. 11-cv-

6434, 2014 WL 3385209, at *7, 2014 U.S. Dist. LEXIS 93318, at *22 (W.D.N.Y. July 9, 2014)

(explaining that a prisoner's retaliation claim stemming from an alleged assault failed as to a

defendant where the plaintiff "did not come forward with evidence to refute [the defendant's]

affidavit"). Thus, summary judgment is granted as to Plaintiff's retaliation claim against Ripa. !

### 2.    Defendants Adams and Waldron

Plaintiff's retaliation claims against Waldron and Adams—that they discontinued his

medication in retaliation for his reports of sexual assault—also fail as a matter of law. For the

reasons described above, no reasonable juror could conclude that Plaintiff had been sexually

assaulted, and for many of those same reasons, it is questionable whether a reasonable juror

could conclude that he had reported that he had been sexually assaulted before his medications

were discontinued. *See Smith v. Fischer*, No. 07-cv-1264, 2009 WL 632890, at *8, 2009 U.S.

Dist. LEXIS 129478, at *38 (N.D.N.Y. Feb. 2, 2009), *report and recommendation adopted*, 2009

WL 5449125, 2009 U.S. Dist. LEXIS 18153 (N.D.N.Y. Mar. 9, 2009) (dismissing retaliation

claim where the alleged adverse action occurred before the plaintiff's protected conduct).

      Nevertheless, even assuming Plaintiff reported a sexual assault to Waldron and Adams

prior to the discontinuation of his medications, his retaliation claim still fails. As to Waldron,

Plaintiff does not contest that, as a nurse, she did not have the authority to discontinue his

medications. (Dkt. No. 103-35, ¶ 32). Accordingly, she could not have taken the adverse action

he alleges.

      As for Adams, Plaintiff has failed to raise an issue of fact as to a causal connection. "The

causal connection must be sufficient to support an inference that the protected conduct played a

substantial part in the adverse action." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y.

2002). A plaintiff "must aver some 'tangible proof' demonstrating that [his] protected speech

animated" the adverse action. *Washington v. Cty. of Rockland*, 373 F.3d 310, 321 (2d Cir. 2004)

(quoting *Deters v. Lafuente*, 368 F.3d 185, 190 (2d Cir. 2004)). A showing of temporal

proximity, without more, has generally been found insufficient to survive summary judgment.

*See Roseboro v. Gillespie*, 791 F. Supp;.2d 353, 370 (S.D.N.Y. 2011). Here, Plaintiff does not

point to any statements by Adams indicating retaliatory intent. *See, e.g.*, *Shariff v. Poole*, 689 F.

Supp. 2d 470, 479 (W.D.N.Y. 2010) (explaining that, inter alia, "statements by the defendant

regarding his motive" provide support for a causal connection between protected conduct and

adverse action (citing *Colon*, 58 F.3d at 872–73)). Further, Plaintiff's evidence "fails to

establish" that Adams "had a motive to retaliate arising" from Plaintiff's alleged report of sexual

assault at a separate correctional facility. *Hare v. Hayden*, No. 09-cv-3135, 2011 WL 1453789, at

*4, 2011 U.S. Dist. LEXIS 40683, at *12–13 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.").

Moreover, Defendants have established that Adams "had legitimate non-retaliatory reasons" for discontinuing Plaintiff's medications. *Vail v. Lashway*, No. 9:12-cv-1245, 2014 WL 4626490, at *19, 2014 U.S. Dist. LEXIS 129516, at *49 (N.D.N.Y. July 16, 2014), *report and recommendation adopted*, 2014 WL 4626490, 2014 U.S. Dist. LEXIS 128506, at *2 (N.D.N.Y. Sept. 15, 2014). Specifically, Adams stated that he discontinued the Naproxen prescription because "it can aggravate the stomach and worsen" Plaintiff's acid reflux. (Dkt. No. 103-33, ¶ 26). He further stated that he discontinued the Neurontin because it was Adams's "clinical impression" that Plaintiff "was seeking pain medication without being able to provide any specifics about the cause or extent of his pain" and that the Neurontin "should not be prescribed until plaintiff was fully evaluated by a provider." (Dkt. No. 103-33, ¶ 27). *See Graham*, 89 F.3d at 81 ("[The plaintiff's] version of events would be insufficient as a matter of law even if true (even if the defendants were retaliating against protected conduct) if there were proper, non-retaliatory reasons for his punishment."). Thus, summary judgment is granted to Adams and Waldron on Plaintiff's retaliation claims.[1]

## F.    Deliberate Indifference to Medical Needs

Defendants Adams, Waldron, and Samolis argue they are entitled to summary judgment on Plaintiff's claim that they denied him treatment for sexual assault. (Dkt. No. 103-41, at 27). To establish "an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). "This standard incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective

'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind. *Id.* To satisfy the objective prong, "the alleged deprivation must be . . . 'sufficiently serious.'" *Chance*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994)). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.* (quoting *Hathaway*, 37 F.3d at 66). "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). "[N]on-medical personnel may be liable for deliberate indifference to medical needs where a plaintiff demonstrates that such personnel intentionally denied or delayed medical care." *Crandell v. Ross*, 19-cv-6552, 2020 WL 134576, at *4, 2020 U.S. Dist. LEXIS 5484, at *11 (W.D.N.Y. Jan 13, 2020) (quoting *Starling v. Syracuse Police Dep't*, No. 19-cv-1458, 2019 WL 6974731, at *5, 2019 U.S. Dist. LEXIS 218968, at *8 (N.D.N.Y. Dec. 20, 2019), *report and recommendation adopted*, 2020 WL 1140664, 2020 U.S. Dist. LEXIS 40178 (N.D.N.Y. Mar. 9, 2020)).

Plaintiff's medical indifference claims against Adams, Waldron, and Samolis fail because he cannot establish that he was sexually assaulted, which is his alleged serious medical need. *See Harrison v. Barkley*, 219 F.3d 132, 136–37 (2d Cir. 2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain'" (quoting *Chance*, 143 F.3d at 702)); *see also, e.g.*, *Davidson v. Scully*, 155 F. Supp. 2d 77, 90 (S.D.N.Y. 2001) (granting summary judgment where the plaintiff did "not suffer from a serious medical need to which defendants [were] deliberately

indifferent"). Accordingly, summary judgment is granted on Plaintiff's Eighth Amendment medical indifference claims against Adams, Waldron, and Samolis.

## VI.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 103) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 103) is **DENIED** as to Plaintiff's procedural due process claim with respect to assistance and the opportunity to call a witness; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 103) is otherwise **GRANTED** and all causes of action, with the exception of the above-described due process claim, are **DISMISSED with prejudice**; and it is further

**ORDERED** that Defendants Ripa, Oropallo, Adams, Waldron, Soucia, and Samolis are **DISMISSED** from the case.

**IT IS SO ORDERED.**

Dated: June 1, 2020
      Syracuse, New York

Brenda K. Sannes
U.S. District Judge